UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
YEOSHUA SORIAS and                          :
ZILICON ACCESSORIES LLC,                    :     14 Civ. 2897 (WFK) (SMG)
   Plaintiffs,                              :
                                            :     **JURY TRIAL DEMANDED**
                                            :
     -against-                           :
                                            :     **FOURTH AMENDED**
NATIONAL CELLULAR USA, INC.,                 :     **COMPLAINT FOR PATENT**
MARK GROSSMAN, ZEEV GROSSMAN,                :     **INFRINGEMENT, TRADE**
DAVID GROSSMAN, YISHAI Z. PLINER,            :     **SECRETS VIOLATION,**
LLOYD GLADSTONE, PRONG, LLC,                 :     **BREACH OF CONTRACT,**
and DOES 1 through 10,                       :     **AND RESCISSION**
   Defendants.                              :
--------------------------------------------------------X


## FOURTH AMENDED COMPLAINT


      Yeoshua Sorias ("**Sorias**") and Zilicon Accessories, LLC ("**Zilicon**") (collectively, the "**Plaintiffs**"), by and through their undersigned counsel, Sam P. Israel, P.C., as and for their Fourth Amended Complaint against defendants National Cellular USA, Inc. ("**NC**"), Mark Grossman, Zeev Grossman, and David Grossman (collectively the "**Grossmans**"), Yishai Z. Pliner ("**Pliner**"), Lloyd Gladstone ("**Gladstone**"), Prong, LLC ("**Prong**") (altogether, the "**Defendants**")[1] allege as follows:


## THE NATURE OF THE ACTION

     1.     This is an action for patent infringement, trade secrets violation, breach of a valid and enforceable licensing agreement and unjust enrichment.

     2.     With his mobile phone integrated charger, Sorias stood to revolutionize the industry for cell phone accessories. Sorias having designed and created the first charger case to render standard wire-based chargers obsolete, cell phone users who formerly needed to carry boxy, wire-based charger units to plug into phones, then electrical outlets, can now deploy one

---

[1] The Grossmans and NC are collectively referred to herein as the "**NC Defendants**"; Pliner, Gladstone and Prong are collectively referred to herein as the "**Prong Defendants**."

small, lightweight device to charge their phones, and even protect them from damage associated with daily use. This combined phone case/ charger unit is uniquely designed with a distinctive look, thinness, and efficiency, and has the extra feature of chargeability that previously did not exist.

3.      While the idea of a mobile phone charger was neither novel nor even currently unique, before Sorias' invention, none had solved the problem of bulk inherent in integrating alternating-current ("**A/C**") electrical plugs into a cell phone case with portability and user convenience. Sorias' innovative design features specially-made electrical components in a unique arrangement to achieve a slim profile not previously thought possible, complemented by the A/C prongs folding horizontally, away from each other and flush with the back of the case, in a way that does not add much thickness to the cell phone case.

4.      The intellectual property attendant to this achievement is subject to broad protection, including utility and design patents. Yet, its innovative design has led to imitation by competitors, including by defendant Prong. As alleged in further detail below, through the NC Defendants' breach of an aborted license conferred by Plaintiffs, and the NC Defendants' violation of a non-disclosure agreement, Prong obtained Sorias' trade secret and confidential information and used it to design and manufacture a charger that looks and functions exactly like the charger described in Sorias' patents. In fact, the Prong Defendants at all relevant times were aware of the prosecution of Sorias' patent, and Prong's principal, Pliner, even approached Sorias on at least one occasion with an offer to obtain a license or outright purchase the pending patent from Sorias. Although the Plaintiffs rejected Pliner's offers, the Prong Defendants introduced into the market a charger that directly infringes at least one of the claims of Sorias' now fully-registered patents (the "**Prong Charger**").

5.      The Plaintiffs seek to arrest the Prong Defendants' unlawful manufacturing, marketing, offering to sell, and selling of the Prong Charger, as well as recover damages attendant to Prong's unauthorized and infringing activities.

6.      Further, beyond their breaches of the governing license agreement, the NC Defendants also intentionally or recklessly disclosed trade secret and confidential information in derogation of their non-disclosure obligations, thereby leaking the information indirectly to Prong and causing Plaintiffs to suffer damages, as further explained below.

## THE PARTIES

7.      Plaintiff Sorias is an individual residing in Kings County, New York.

8.      Plaintiff Zilicon Accessories, LLC is a New York limited liability company, with a principal place of business located at 1222 Avenue M, Brooklyn, New York, 11230 in which Sorias is a principal and officer.

9.      Upon information and belief, defendant National Cellular USA Inc. (NC), is a New York corporation engaged in the production, marketing of cell phone accessories, with its principle place of business located at 5620 First Avenue, Brooklyn, New York.

10.      Upon information and belief, defendant Mark Grossman is an individual residing in New York, New York, as well as a principal and officer of NC.

11.      Upon information and belief, defendant Zeev Grossman is an individual residing in New York, New York, as well as a principal and officer of NC.

12.      Upon information and belief, defendant David Grossman is an individual residing in New York, New York, as well as a principal and officer of NC.

13.      Upon information and belief, Mark Grossman, Zeev Grossman, and David Grossman are brothers and jointly run all the affairs and make all of the key decisions relative to the business of NC.

14.      Upon information and belief, defendant Prong, LLC (n/k/a Prong, Inc.) is a Delaware limited liability company headquartered and doing business in New York, with its principal place of business located at 1123 Broadway, Suite 700, New York, New York 10010. Prong produces, markets, and sells cell phone cases with integrated A/C charging plugs to U.S. consumers throughout the country and abroad.

15.      Upon information and belief, defendant Yishai Z. Pliner is an individual residing in New York, New York, as well as a principal and officer of Prong.

16.      Upon information and belief, defendant Lloyd Gladstone is an individual residing in New York, New York, as well as a principal and officer of Prong.

17.      Upon information and belief, Pliner and Gladstone jointly run the affairs and make all of the key decisions relative to the business of Prong.

3

## JURISDICTION AND VENUE

18.    This Court has personal jurisdiction over each of the Defendants by reason of their residence in this District, their transaction of business in this District, and their commission of infringing or injurious acts within this District.

19.    This Court has subject matter jurisdiction under 28 U.S.C. §1331 (federal question), 28 U.S.C. §1338(a) (any Act of Congress relating to patents or trademarks), 28 U.S.C. §1338(b) (any claim of unfair competition joined with claims arising under patent laws), and 28 U.S.C. §1367 (supplemental jurisdiction).

20.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 and §1400 because the Defendants transact business within this district and offer for sale and/or sell in this district products that infringe Sorias' patents. Additionally, venue is proper because Sorias and the individual defendants all reside in this district, and because Zilicon's principal place of business is in this district.


## FACTS

### SORIAS' PATENTS AND PROTECTED TRADE SECRETS

21.    Sorias is an inventor and patent owner of various electronic devices and accessories. He is a founder, principal, and officer of Zilicon Accessories, LLC—a company that engages in designing and manufacturing innovative wireless and electronic devices. Sorias invents, manufactures, and sells his creations, often in conjunction with Zilicon, which has an exclusive license to manufacture and distribute several of his inventions, including the device described in Sorias' patents at issue in this action.

22.    Many of Sorias' inventions include technical elements and accessories associated with mobile electronic devices, such as battery chargers that are implemented as functional covers for mobile devices. Sorias has protected his innovative designs and technologies by legally securing his intellectual property rights, including by applying for and being awarded a number of U.S. patents.

23.    Having worked for over six years as the purchasing manager at a leading distributor of cell phones and accessories, in 2010 Sorias invented the *Detachably Integrated*

4

*Battery Charger For Mobile Cell Phones And Like Devices,* a thin cell phone case that doubles as a charger. Sorias' creation comprises a charger that can be kept attached to the backside of the phone as a case, with A/C prongs folding in and out in opposite directions, and merging horizontally onto the back of the charger, flush with the case. Its compactness and portability make Sorias' charger look and feel like a regular cell phone cover, but with the added benefit of the A/C prongs such that the cell phone can easily be plugged into an outlet and charged without the need to utilize a standard, separate charging device.

24.     Sorias thus created the first practical and carryable mobile phone case with an integrated A/C charger.  Other, later-revealed patent applications showed charger designs for other electronic devices with *parallel* A/C prong units that would detach or pivot in and out vertically (thus substantially adding to the thickness of the case); none existed as envisioned by Sorias—to wit, a protective cell phone case with an integrated wall charger, having the regular thinness of a normal cell phone case case, by virtue of both the unique arrangement of specially-made electrical components and the A/C prongs folding in and out horizontally (thus adding almost no additional thickness to the case).

25.     The patent for Sorias' *Detachably Integrated Battery Charger For Mobile Cell Phones And Like Devices* was granted by the United States Patent and Trademark Office (the "**USPTO**") on April 29, 2014.  *See* **Exhibit A** (U.S. Patent No. 8,712,486 [the "**'486 Patent**"]).

26.     The '486 Patent derives from a provisional patent application, No. 61/432,050, filed by Sorias on January 12, 2011 (the "**Provisional Application**"). *See* **Exhibit B**. Thus, the '486 Patent claims priority to the Provisional Application.

27.     Sorias is a named inventor on and owns all rights, title, and interest in and to the '486 Patent.

28.     Zilicon currently holds an exclusive license to manufacture and sell the invention described in the '486 Patent.

29.     Because no such device existed when Sorias filed his patent application, he had taken considerable measures to protect the secrecy of the invention. For instance, Sorias did not reveal any information about the device and maintained in a private location all of the paperwork and drawings pertaining to it, including the patent application materials. When Sorias began his

search for potential investors who might lend the capital and manufacturing wherewithal to the development and ultimate sale of his device, Sorias ensured that any and all such potential investors were provided with, and signed, a non-disclosure agreement ("**NDA**").

30.     Other than Sorias' patent counsel and the individuals or entities who were parties to (or covered by) the NDAs, no one else had access to the drawings or information pertaining to Sorias' inventions prior to July 12, 2012 (the "**Publication Date**"), when the application that resulted in the issuance of the '486 Patent was published and made publicly available by the USPTO.

31.     During the pendency of this litigation, on March 3, 2015, Sorias was granted a design patent for the "ornamental design for a phone charger," as depicted in the '486 Patent. *See* **Exhibit C (U.S. Patent No. D723,457 S [the "'457 Patent"])**.

32.     The foregoing patents are a product of years' worth of Sorias' time, effort, and skill. By filing his patents, Sorias intended to facilitate the making, marketing, and selling of the devices in the United States and abroad.  Sorias has himself invested $1,000,000.00 in his efforts to develop and bring to market his invention.

THE SORIAS-NC LICENSING AGREEMENT AND GOVERNING NDA

33.     Prior to obtaining the '486 Patent but after Sorias filed the Provisional Application, he set out to search for prospective investors who would be interested in partnership and/or licensing opportunities in connection with the device as envisioned by Sorias.

34.     On or about January 13, 2011, Sorias met with the Grossmans and other NC investors, namely Benjie Brecher and Al Brecher, during which a potential partnership or licensing deal between Sorias and NC was discussed. After the Grossmans signed an NDA, Sorias presented them with the materials and information included in the Provisional Application, drawings of the device, and a prototype that simulated the charger, albeit without the circuitry.

35.     Sorias' prototype consisted of a makeshift phone cover with two prongs that simulated folding in and out horizontally, as depicted on the following photograph created by Sorias:



36.     In response to the presentation, the Grossmans hailed Sorias' invention as an instant success and immediately offered a 50% partnership with NC.

37.     On or about April 7, 2011, Sorias received a letter of intent ("**LOI**") from the Grossmans that stated that NC would have the exclusive rights to manufacture and sell Sorias' charger, provided that NC produce working samples of the charger within three months of the LOI's execution. If, using its best efforts, NC was unable to achieve its goal within the designated time period, then Sorias would be free to pursue other options or investors to realize his goal of producing and selling the charger. Notwithstanding NC's ultimate success or failure in producing the working samples, NC was bound by the NDA to keep Sorias' information secret.

38.     On or about July 7, 2011—three months after the LOI was executed—Sorias insisted upon examining the promised samples of the device. But NC reported that the Grossmans found it "unrealistic and impossible" to engineer a charger with the thinness required by Sorias' designs. Sorias was disappointed by NC's failure to make good on its promises under the LOI. He advised the Grossmans of his plans to commence searching for other partnership opportunities. Still, the Grossmans convinced Sorias to give NC more time to produce the required sample.

39.     In or about August of 2011, Sorias again met with Al Brecher and the Grossmans who presented him with a blueprint from a manufacturing facility in China, which depicted a device allegedly made pursuant to Sorias' design, but which Sorias found to be still too thick to be portable and marketable to consumers.

40.     Specifically, the blueprint provided to Sorias at the August 2011 meeting with NC showed a charger-case intended for use with the iPhone 3G, with the "charger" portion measured at approximately 16 millimeters ("mm") in depth or "thickness."   The blueprint separated the thickness dimensions of the device into a charger-components section and a section for the housing of the actual cell phone.   The iPhone 3G possessed a thickness dimension of 12.3 mm, and, when combined with the separately-measured charger-component section, the blueprint depicted a device with an overall thickness of approximately 28 mm.

41.     When Sorias objected that the depicted device was far too thick, NC represented to him that, though they had tried, they found it impossible to make the charger device any thinner than was shown in the blueprint.   Sorias insisted that he would be able to make the charger-components section with a thickness below 16 mm.   Sorias rejected NC's proposed plans and advised the Grossmans that the deal was off inasmuch as NC had not timely met the requirements of the LOI.

42.     Despite their obligations to maintain the secrecy of the information produced to them under the NDA, the Grossmans retaliated by threatening to disclose it unprotected to third parties. Mark Grossman went so far as to proclaim that he had no compunction about disclosing Sorias' trade secrets this way, stating to Sorias that "nobody ever won a case based on an NDA because I can find a way to go around it." Mark Grossman further insisted that if Sorias failed to cooperate with NC, NC would simply make and sell the device without him.

43.     In the fall of 2011, Sorias, seeking to prevent NC from disclosing his confidential information or violating his patent, instituted against the NC Defendants an arbitration session conducted by a rabbi in their community. The Grossmans failed to attend the first arbitration session arranged by Sorias.

44.     Prior to the second arbitration session arranged by Sorias, NC contacted Sorias to suggest a potential solution: given NC's representation at the August 2011 meeting that the charger-component portion of the device could not be manufactured at a thickness below 16 mm, and Sorias' insistence that the thicker NC device would not be marketable and that a thinner device was indeed possible, each party would receive different rights to make the charger-case based upon those representations of thickness.

45.     Upon NC's proposal of these new terms, by December 22, 2011 the Grossmans

and Sorias reached an agreement pursuant to which NC was given a license to manufacture and sell chargers based on the Provisional Application having a thickness of 16 mm or greater, while paying Sorias the agreed-upon royalty from the sale of those chargers. Sorias retained the exclusive right to make and sell chargers with a thickness below 16 mm (he subsequently granted Zilicon the exclusive license with respect to these devices). Attached as **<u>Exhibit D</u>** is a true and correct copy of the License Agreement between the Plaintiffs and NC (the "**License Agreement**").

46.     The License Agreement states that Sorias "grants National Cellular an exclusive right and license to make the Sorias Product at a thickness which is equal to or greater than 16mm, until December 2018. … Sorias retains exclusive rights to manufacture and market, either himself or through his assignees and/or licenses, the Sorias Product at thickness[] of less than 16mm." Ex. D, License Agreement at ¶¶ 3–4.

47.     The "thickness" of 16mm—as envisioned by the parties to the License Agreement and confirmed through subsequent communications—was based upon the representation of the device as contained in the August 2011 blueprint and relates to the measurement of the charger unit, not including the parallel side panels of the case that hold the phone in place, as illustrated by the following diagrams:





48.     The License Agreement further provides that, "within 180 days of the signing of this Agreement … [NC] will have first production runs of the Sorias Product and will provide **at least three samples** thereof to Yeoshua Sorias, as soon as available.  If it fails to meet that requirement, its License herein shall expire." Ex. D, License Agreement at ¶ 10 (emphasis added).

49.     On or about June 20, 2012—*after* the agreed-upon 180-day period had already expired—and having received no updates or information from NC regarding the development of the charger, despite repeated requests for same, Sorias went to NC's offices at the Grossmans' invitation, expecting to see the promised "three samples."   Instead, the Grossmans refused to present the samples, and instead insisted that Sorias sign a letter that they had prepared, which stated:

> Dear Josh,
>
> By signing below you are confirming receipt of the 3 working and completed samples of the iPhone case with outlet prongs as per our agreement specks (sic) (please see pictures below). Also, you agree that you have seen and verified the documentation from our overseas producers that the product production has begun."

50.     Yet, none of the so-called "documentation from … [NC's] overseas producers…" had been shown to Sorias.  When Sorias requested to see the referenced documentation prior to

signing the letter, NC's representative Levy Salvay produced a small piece of paper, approximately 1 x 1 inches in size, with three words handwritten on it. Upon information and belief, the three words on that scrap of paper were "we start production" or "we begin production." The Grossmans refused to provide Sorias with any information regarding the source of the scrap of paper or the manufacturers with whom NC was purportedly working.

51.     While, upon information and belief, NC did not even have three production samples of the charger at the time, the Grossmans demanded that Sorias certify that he had seen all three production samples before actually allowing him to see them. Yet, with misguided trust and an eagerness to inspect the promised samples, Sorias signed the letter expecting the Grossmans' representations to be truthful and made in good faith.

52.     At the June 20, 2012 meeting, the Grossmans produced to Sorias' view three "hand sample" (not production sample) chargers, ostensibly manufactured pursuant to the License Agreement. Upon information and belief, all three samples were cosmetically identical, other than the colors of the charger-cases. Sorias was allowed to hold, examine, and retain only two of the samples shown by NC at the June 2012 meeting, and was not given the tools or opportunity to conduct any testing or measurement of the samples during the meeting.

53.     Only after the June 2012 meeting, when Sorias measured NC's prototype charger, he found its thickness to be below 16 mm— the threshold dimension beneath which Sorias reserved all rights to thinner products and which the parties had specifically carved out from NC's exclusive license. Sorias informed the Grossmans that NC was in breach of its License Agreement, as only Sorias had the exclusive right to make and sell chargers with a thickness less than 16 mm.

54.     But NC now insisted that it had a different understanding, arguing that "thickness" refers to the *overall* thickness of the charger case *with* the mobile phone, meaning so long as the two together exceeded 16mm, NC could sell such a charger-case under the license.

55.     NC's claim, however, is belied by numerous emails and communications among Sorias and the Grossmans showing that NC's previous prototypes (untethered to a phone) were thicker than 16 mm without accounting for the added "thickness" of the phone. The NC Defendants have encroached on the Plaintiffs' exclusive rights to make the charger with the thickness of less than 16 mm, failed to provide three production samples of the charger by the

11

contractually-mandated deadline, and failed to deal in good faith with Sorias during the parties' meetings.

56. Despite Sorias' clear and explicit notice to the NC Defendants that the License Agreement had been breached, and that NC no longer held any rights with regard to Sorias' invention, the NC Defendants continued to manufacture and made efforts to sell mobile phone chargers using information provided to them by Sorias and in the application for the '486 Patent.

57. Thus, the NC Defendants secretly marketed their non-compliant device to Apple, Inc. ("**Apple**") and, upon information and belief, even filed a competing patent application, in clear violation of the License Agreement.

THE NC DEFENDANTS' INFRINGEMENT AFTER PUBLICATION

58. The NC Defendants maintained these efforts to make and sell a contractually-barred mobile phone charger beyond the Publication Date.

59. For example, between the Publication Date and the end of 2013, the NC Defendants were communicating with designers and manufacturers with regard to making mobile phone chargers that would incorporate technology described in the '486 Patent.

60. Additionally, the NC Defendants made significant efforts between the Publication Date and December 2013 to sell and distribute to Apple and other retailers mobile phone chargers that would incorporate technology described in the '486 Patent.

THE NC DEFENDANTS' MISUSE OF TRADE SECRETS

61. From approximately spring of 2011 until at least mid-2012, NC's responsibilities as Sorias' licensee included locating a manufacturer that would be able to make Sorias' charger in accordance with the specifications provided in Sorias' secret designs. As part of those obligations, NC's representatives frequently traveled to China during that time period, and/or communicated with engineers, designers and certain professionals, both domestic and abroad, regarding the making of Sorias' charger.

62. Meanwhile, from the time he filed the Provisional Application and throughout the negotiations with NC, Sorias had carefully safeguarded the proprietary nature of his intellectual property, including its carefully preserved data and designs, which comprise legally protected trade secrets. The NC Defendants, for their part, failed to take measures to protect this

information when entrusted to them by Sorias in accordance with the strictures of the NDA, which specifically prohibited NC Defendants from unbridled disclosure of such confidential information to third parties.

63.     Indeed, when disseminating the trade secret information preceding the full registration of Sorias' patents, the NC Defendants liberally supplied their content to various individuals in China and/or the United States without first ensuring that the recipients sign an NDA or treat the information as confidential.

64.     Indeed, as alleged above, in or about the fall of 2011, Mark Grossman admitted that he had no compunction about disclosing Sorias' trade secrets to third parties. In furtherance of his threat, at least one email communication sent from NC to certain individuals in China contained drawings and specifications of Sorias' charger, without the transmission of an NDA beforehand.

65.     Upon information and belief, by reason of the NC Defendants' intentional or reckless acts, Sorias' trade secret and confidential information became available to potential competitors of Zilicon, including Prong.  Indeed, upon information and belief, Prong obtained Sorias' trade secret and confidential information, either by the Grossmans' disclosure to third parties or proximately through Prong's manufacturing and/or design contacts associated with NC's manufacturing and/or design contacts.

66.     By approximately March 2012, Sorias came across a Kickstarter campaign page on which Prong was indeed advertising a device that was based on, and using the same technology and design as those described in the Provisional Application (and Sorias' subsequently-granted patents). Sorias found that the charger depicted in the Kickstarter campaign looked *exactly* like the sample charger provided to Sorias by the Grossmans during the June 20, 2012 meeting. NC's sample charger involved identical cosmetic and functional features, such as the "ribbed" case sides and a release button for the A/C prongs.

67.     Sorias was personally acquainted with one of Prong's principals, Pliner, from a university in Israel, where Sorias worked as a dormitory counselor while Pliner attended as a student. Pliner did not have a background in engineering or experience in the cell phone accessories industry; likewise, Pliner's partner, Gladstone, was a lawyer from Florida lacking altogether the relevant education and industry experience to create the charger that they were

marketing on Kickstarter.

<u>PRONGS' INFRINGEMENT OF THE '486 PATENT AND THE DESIGN PATENT</u>

68.     In or around September 2013, after the USPTO posted a favorable Office Action with regard to the application that became the '486 Patent, Pliner called Sorias to congratulate him on the pending approval of his patent and offered to meet to discuss a potential partnership with Prong, namely, a license to continue Prong's Kickstarter campaign to lawfully make and sell the Prong Charger.

69.     In or about October 2013, Sorias met with Pliner and Gladstone, and the three individuals discussed various options, including a royalty deal and partnership, as well as Prong's outright purchase of Sorias' prospective patent. During this meeting, Pliner acknowledged that once Sorias' patent was issued, Prong would be infringing if it continued to make, offer for sale and sell the Prong Charger.

70.     The day after the October 2013 meeting, Pliner sent emails to Sorias outlining Prong's proposed terms for agreements with Sorias. In their subsequent telephone communications after the meeting, Pliner represented that Prong would stop all of its efforts with respect to the Prong Charger once Sorias' patent issued.

71.     Whereas the Sorias-Prong negotiations fell apart, when the '486 Patent was issued on April 29, 2014, the Prong Defendants came to actually make, offer for sale, and sell a mobile phone charger with horizontally-folding A/C prongs that was the same as Sorias' device protected under the '486 Patent. The Prong Charger includes all of the limitations of at least one claim of the '486 Patent and the Design Patent.

72.     The Prong Defendants not only continued their infringing promotional and sales efforts *via* Kickstarter (which began no later than March 2012), but they announced their illegal efforts on Prong's website, www.prong.com, which promotes the Prong charger as "the only case[] with integrated charging prongs" and the "first of its kind in the world." Further, upon information and belief, the Prong Defendants have sold and continue to sell the infringing Prong Charger through Kickstarter, Prong's website, and Amazon.com.

73.     As recently as February 25, 2015, another website, www.Indiegogo.com ("**Indiegogo**"), has made its crowdfunding platform available to Prong to pool money from

investors for a new model of the Prong Charger intended to be compatible with the iPhone 6, Indiegogo has purported to: "highlight activities within [Prong's] network"; "Provid[e] a Partner Page" to "Build[] brand recognition and influence through strategic brand placement on sponsored campaign pages"; as well as "Offer[] dedicated partner support, educational tools, and a partner launch at partnersupport@indiegogo.com."

74.     According to Indiegogo's website, Prong's CEO, Lloyd Gladstone said that, with Indiegogo's help, Prong has "raised over $52,300, which is a pretty fantastic feat. … However, we're not done! We want to keep the ball rolling and let more people know about how they can cut the cord and take charge. Please help us by copying and pasting this link to share on social media: http://igg.me/at/prong."

75.     The Prong Defendants and Indiegogo raised more than enough funds needed to manufacture and distribute the infringing Prong Charger within the United States. Indeed, deliveries of the new infringing charger are expected in June of 2015.

76.     In addition to the monies raised through these crowdfunding campaigns, Prong has also received millions of dollars from private investors who clearly see merit in the charger-case concept (but may not be aware that Sorias, not Prong, holds the valid patent for such a device).


### COUNT I

(Against the Prong Defendants for Patent Infringement)


77.     The Plaintiffs re-allege and incorporate by reference the above allegations of this Fourth Amended Complaint, as though fully set forth herein.

78.     The Plaintiffs own and have the rights, title, and interest in and to the '486 Patent and the Design Patent, the underlying invention of which is primarily directed to a mobile phone charger that can be kept attached to the backside of the phone, with A/C prongs folding in opposite directions flatly onto the back of the charger, so the phone with its charger can easily fit in one's pocket.

79.     The Prong Defendants have been fully aware of the prosecution of the '486 Patent

and its eventual issuance since at least July of 2012.

80.     Prong's principal, Pliner, has approached Sorias on at least one occasion offering to enter into a licensing agreement in order to enable Prong to *lawfully* make and sell the Prong Charger. Though the Prong Defendants and Sorias could not reach a licensing agreement and the Plaintiffs never granted Prong Defendants any rights in connection with the '486 Patent or the Design Patent (and, accordingly, the Prong Charger), the Prong Defendants nevertheless knowingly and willfully continue to make, advertise, offer for sale and sell the Prong Charger without a license or any justification at law or in equity.

81.     As of the filing of this Fourth Amended Complaint, the Prong Defendants have made, used, offered to sell and sold within this judicial district the Prong Chargers that directly infringes at least one of the claims of the '486 Patent and at least one of the claims of the Design Patent.

82.     Between the Publication Date and the issuance of the '486 Patent, the Prong Defendants made significant efforts to make, sell, use, or offer to sell a product containing technology protected by the '486 Patent.  These actions infringed upon the Plaintiffs' patent rights, according to 35 U.S.C. § 154(d).  Under the statute, the Plaintiffs are entitled to recover "a reasonable royalty" in an amount to be determined at trial for Prong's infringing actions prior to April 29, 2014.

83.     The Prong Defendants have not abated their infringing activities; rather they have expanded them in scope. After the first Complaint was filed in this action, the Prong Defendants launched another crowdfunding campaign *via* Indiegogo. The Prong Defendants and Indiegogo raised more than enough funds needed to manufacture and distribute infringing Prong Chargers within the United States. Indeed, deliveries of the infringing charger are expected in June of 2015.

84.     At all pertinent times, the Prong Defendants had the specific intent to infringe the '486 Patent and the Design Patent by virtue of their actual knowledge of the prosecution of the '486 Patent and Pliner's prior offers to enter into a licensing agreement with Sorias.

85.     As a result of the Prong Defendants' knowing and willful infringement, the Plaintiffs have suffered and will continue to suffer financial losses, loss of good will, and erosion

16

of the profit that Plaintiffs could have realized upon introducing their own chargers in the market.  Plaintiffs are entitled to recover compensatory damages in an amount to be determined at trial, but not less than $ 10,000,000, which should be trebled due to the Prong Defendants' knowing and willful infringement together with applicable attorneys' fees and costs, as well as interest.


## COUNT II

(Against NC for Breach of Contract)

86.     The Plaintiffs re-allege and incorporate by reference the above allegations of this Fourth Amended Complaint, as though fully set forth herein.

87.     On or about December 22, 2011 NC and Sorias entered into an agreement pursuant to which NC was given a license to manufacture and sell chargers based on Sorias' Provisional Application with a thickness of 16 mm or greater, while paying Sorias the agreed-upon royalty from the sale of those chargers. Sorias retained the exclusive right to make and sell chargers with a thickness below 16 mm (he subsequently granted Zilicon the exclusive license with respect to these devices).

88.     The License Agreement provides that, "within 180 days of the signing of this Agreement … [NC] will have first production runs of the Sorias Product and will provide at least three samples thereof to Yeoshua Sorias, as soon as available.  If it fails to meet that requirement, its License herein shall expire."

89.     On or about June 20, 2012—after the agreed 180-day period had expired—Sorias met with the Grossmans expecting to see the promised "three samples." At that meeting, the Grossmans showed Sorias only one sample of the charger—not three—ostensibly manufactured pursuant to the License Agreement.

90.     When Sorias later measured NC's prototype, he determined that the thickness of the charger was below 16 mm—a size that was specifically carved out for Sorias from NC's exclusive license under the License Agreement, and with respect to which NC had no rights. Sorias informed the Grossmans that NC was in breach of the License Agreement, as only Sorias had the exclusive right to make and sell chargers with a thickness of less than 16 mm.

91.     NC materially breached the License Agreement in several ways.  NC encroached on the Plaintiffs' exclusive rights to make a charger with a thickness of less than 16 mm, failed to provide three production samples of the charger by the contractually-mandated deadline, and failed to deal in good faith with Sorias during the parties' meetings.  For example, NC never provided Sorias a sample of the device that they had apparently attempted to sell to Apple. Additionally, NC apparently filed its own competing patent applications, actions in clear violation of the License Agreement.


## COUNT III

(Against the NC Defendants for Patent Infringement)


92.     Despite Sorias' clear and explicit notice to the NC Defendants that the License Agreement had been breached, and that NC no longer held any rights with regard to Sorias' invention, the NC Defendants continually made efforts to manufacture and sell mobile phone chargers using information provided to them by Sorias and in the application for the '486 Patent.

93.     The NC Defendants maintained these efforts to make and sell such a mobile phone charger beyond the Publication Date, and prior to the granting of the '486 Patent.

94.     For example, between the Publication Date and the end of 2013, the NC Defendants were communicating with designers and manufacturers with regard to making mobile phone chargers that would incorporate technology contained in the '486 Patent.

95.     Additionally, the NC Defendants made significant efforts between the Publication Date and December 2013 to sell and distribute to Apple and other retailers mobile phone chargers that would incorporate technology contained in the '486 Patent.

96.     Through their efforts after the Publication Date to make, sell, or offer to sell a product containing technology protected by the '486 Patent, the NC Defendants infringed upon the Plaintiffs' patent rights, according to 35 U.S.C. § 154(d).  Under the statute, the Plaintiffs are entitled to recover "a reasonable royalty" in an amount to be determined at trial.

## COUNT IV

(Against NC for Rescission of the License Agreement)

97.     The Plaintiffs re-allege and incorporate by reference the above allegations of this Fourth Amended Complaint, as though fully set forth herein.

98.     In cases where mistakes are material to a contract, or where the terms of a contract are induced by fraud, rescission is an appropriate remedy, namely to put the parties back in the position they were in before the agreement was ostensibly entered.

99.     Whereas the License Agreement mandated that NC produce three samples of the charger within a prescribed time period, NC failed to satisfy its material obligation to do so. Yet, the Grossmans demanded that Sorias certify that he saw all three production samples before he would be allowed to see *any* samples of the charger. Sorias, anxious to see the samples promised by NC and eager to move forward with the project, signed the letter under pressure, believing the Grossmans' representations to have been made in good faith.

100.    When Sorias was finally shown the "hand sample" chargers (and allowed to actually examine and take only two of these samples), subsequent measurement revealed that the thickness of the sample charger was below 16 mm— a size that was specifically carved out for Sorias from NC's exclusive license under the License Agreement, and with respect to which NC had no rights. Sorias informed the Grossmans that NC was in breach of their License Agreement, as only Sorias had the exclusive right to make and sell chargers with a thickness of less than 16 mm.

101.    But NC now insisted, contrary to the prior understanding and practice of the parties, that "thickness" refers to the *overall* thickness of the charger case *with* the mobile phone, meaning so long as the two together exceeded 16 mm, NC could sell it under the license.

102.    The NC Defendants failed to deal in good faith with Sorias pursuant to the License Agreement. The NC Defendants materially breached the License Agreement in several material ways, induced Sorias to certify, under pressure, to facts that were not accurate in order to continue their efforts to make and sell Sorias' charger in clear violation of Sorias' rights in the License Agreement.

103.    By reason of the foregoing, as an alternative remedy to breach of contract (Count

II), Sorias is entitled to a judgment rescinding the License Agreement.


## COUNT V

(Against All Defendants for Violation of Trade Secrets and Unfair Competition)


104.    The Plaintiffs re-allege and incorporate by reference the above allegations of this Fourth Amended Complaint, as though fully set forth herein.

105.    Before the information in the '486 Patent was made public, it was valuable confidential information and trade secret, which the Plaintiffs duly protected using reasonable efforts.

106.    The NC Defendants acquired the confidential information through a relationship of trust and by way of the NDA, which imposed a duty upon them not to improperly disclose or use the confidential information and trade secrets belonging to Sorias. At all relevant times, the NC Defendants knew about the confidential nature of this information.

107.    The NC Defendants intentionally or recklessly leaked the Plaintiffs' confidential information and trade secrets by sharing them with certain individuals in China and/or the United States without first ensuring that those individuals sign an NDA or treat the information as a trade secret.

108.    Specifically, at least one email communication sent from NC to certain individuals in China contained drawings and specifications of Sorias' charger; yet no NDA was transmitted with the documents.

109.    Further, on at least one occasion the Grossmans had threatened to disclose Sorias' secret patent designs unless Sorias cooperated with their demands. Namely, in or about the fall of 2011, Mark Grossman went so far as to proclaim that he had no compunction about disclosing Sorias' trade secrets to third parties, then stating to Sorias that "nobody ever won a case based on an NDA because I can find a way to go around it." Thus, the Grossmans *intended* to disclose Sorias' trade secrets.

110.    As a result of the NC Defendants' intentional or reckless acts, the Plaintiffs have suffered and will continue to suffer damages and irreparable harm.

111.   For example, upon information and belief, by reason of the NC Defendants' intentional or reckless acts, Sorias' trade secret and confidential information became available to potential competitors of Zilicon, including Prong.  Indeed, upon information and belief, Prong obtained and misused Sorias' trade secret and confidential information, either via the Grossmans' disclosure to third parties or proximately through Prong's manufacturing and/or design contacts associated with NC's manufacturing and/or design contacts.

112.   As a result of the Prong Defendants' acts, the Plaintiffs have suffered and will continue to suffer damages and irreparable harm.


## PRAYER FOR RELIEF

Plaintiffs request an entry of judgment in their favor as follows:

a) A declaration that the Prong Defendants are liable, jointly and severally, for the infringements of one or more claims of the patents-in-suit;

b) An award of damages adequate to compensate Plaintiffs for the Prong Defendants' infringements of the patents-in-suit, but in no event less than a reasonable royalty, together with prejudgment and post-judgment interest, attorneys' fees and costs, in an amount according to proof;

c) An entry of a permanent injunction enjoining the Prong Defendants and their respective officers, agents (including, but not limited to companies hosting Prong's crowdfunding campaign), employees, and those acting in privity with them, from further infringements of the patents-in-suit, or in the alternative, awarding a royalty for post-judgment infringement;

d) an order requiring that the NC Defendants and Prong Defendants immediately deliver to the Plaintiffs or destroy all unauthorized infringing devices, including the Prong Charger;

e) An award of damages adequate to compensate Plaintiffs for the violations of the Plaintiff's trade secrets by the NC Defendants, together with prejudgment and post-judgment interest, attorneys' fees and costs, in an amount according to proof;

f) An award of damages adequate to compensate Plaintiffs for the breach of License Agreement by NC, together with prejudgment and post-judgment interest and costs, in an amount according to proof, or, alternatively, rescinding the License Agreement;

g) An award of "a reasonable royalty" as determined by the finder-of-fact, pursuant to 35 U.S.C. § 154(d), from the NC Defendants for their infringement of the Plaintiffs' rights during the period between the Publication Date and the granting of the '486 Patent; and

h) An award to Plaintiffs of such other costs and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Plaintiffs respectfully request a trial by jury.

Dated:   April 10, 2015
New York, New York

RESPECTFULLY SUBMITTED:

SAM P. ISRAEL, P.C.

By:   _____

Sam P. Israel (SPI0270)
Timothy L. Foster (TF0017)
Eleonora Zlotnikova (EZ8814)
*Attorneys for Plaintiffs Yeoshua Sorias and Zilicon Accessories LLC*
1 Liberty Plaza, Thirty-Fifth Floor
New York, New York 10006
T:   646-787-9880   |   F:   646-787-9886
samisrael@spi-pc.com

22